Walt MODEN; et al., Plaintiffs,

v.

UNITED STATES FISH AND WILDLIFE SERVICE; et al., Defendants.

Civil No. 02–305–JO.

United States District Court, D. Oregon.

Sept. 3, 2003.

---

James L. Buchal, Murphy & Buchal, L.L.P., Portland, OR, for Plaintiffs.

Michael W. Mosman, United States Attorney, District of Oregon, Portland, OR, Ruth Ann Lowery, Washington, DC, for Defendants.

## OPINION AND ORDER

ROBERT E. JONES, District Judge.

In this lawsuit, plaintiffs Walt Moden, et al. ("Moden") contend that defendants United States Fish and Wildlife Service, et al. ("FWS"), arbitrarily and capriciously denied plaintiffs' petition to remove the Lost River and shortnose sucker fishes from the list of endangered species under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.* Defendants have moved for summary judgment (# 33) on the first claim in the amended complaint, contending that the FWS properly denied the petition because it lacked "substantial commercial or scientific information indicating that the petitioned action may be warranted," as the statute requires before an agency must undertake a review of the status of the species concerned. Further, defendants contend that the ruling on the petition is entitled to deference under the Administrative Procedure Act ("APA"). Defendants also move for summary judgment on plaintiffs' second claim, alleging that plaintiffs did not comply with the notice requirement and, in any event, the standard and scope of review is the same as the first claim. In response, plaintiffs argue that the testimony of their scientist, David Vogel, as well as other information submitted, demonstrates that the sucker populations have rebounded and delisting may be warranted. Plaintiffs have filed a motion (# 37) to supplement the administrative record with five documents that relate to listing of the suckers as endangered and to the suckers' tolerance for drought conditions. Defendants contest plaintiffs' motion to supplement because no applicable exception exists to the general rule restricting review to the administrative record.

For the reasons that follow, I deny defendants' motion for summary judgment with respect to plaintiffs' first claim because FWS's finding that substantial information had not been presented in the petition reaches unexplained conclusions not supported by the administrative record. I remand plaintiffs' first claim to FWS to either reissue the Initial Finding with more explanation on two matters or proceed to a status review. I grant defendants' motion for summary judgment on plaintiffs' second claim because plaintiffs did not provide the appropriate notice before filing suit. Finally, I grant plaintiffs' motion to supplement the record because the documents submitted will assist in determining whether the FWS considered all relevant factors.

## BACKGROUND

### A. Factual background.

The Lost River sucker (*Deltistes luxatus*) and shortnose sucker (*Chasmistes brevirostris*) ("Lost River sucker," "shortnose sucker," or collectively "suckers") occur naturally only in the Klamath Basin of Southern Oregon and Northern California.

*Endangered and Threatened Wildlife and Plants: Notice of 90–Day Finding on a Petition to Delist the Lost River Sucker and Shortnose Sucker,* 67 Fed.Reg. 34422–23 (May 14, 2002) ("Initial Finding"). The suckers have long life spans, with the Lost River sucker documented to reach at least forty-three years of age and the shortnose sucker reaching at least thirty-three years of age. *Biological/Conference Opinion Regarding the Effects of Operation of the Bureau of Reclamation's Klamath Project on the Endangered Lost River Sucker, Endangered Shortnose Sucker, Threatened Bald Eagle, and Proposed Critical Habitat for the Lost River/Shortnose Suckers,* Klamath Falls Fish and Wildlife Office, April 2001, Section I, page 1 ("2001 status report"). Adult Lost River suckers can reach 39 inches in length, while adult shortnose suckers are generally less than 20 inches in length. 2001 status report at Section III, Part 2, page 5. Male Lost River suckers become sexually mature at four years of age, with female Lost River suckers maturing between seven and nine years of age; shortnose suckers reach sexual maturity at six to seven years of age. 2001 status report at Section III, Part 2, page 6.

The fish were once abundant and were an important seasonal food of Native Americans and white settlers in the Upper Klamath River basin. 2001 status report at Section III, Part 2, page 6. By one estimate, the aboriginal harvest at one location on Lost River may have totaled fifty tons annually. *Id.* at 2. The 2001 status report cites a 1900 report from the Klamath Republican newspaper that suckers "were so thick in the Lost River that a man with a pitch fork could throw a wagon load in an hour." *Id.* From 1959 to 1987, Oregon operated a sport fishery for the Lost River suckers. *Id.* at 2.

In 1988, the FWS listed both species of suckers as endangered, finding that the "primary factors in the widespread decline of the shortnose sucker and Lost River suckers have included damming of rivers, instream flow diversion, draining of marshes and other forms of water manipulation." *Endangered and Threatened Wildlife and Plants; Proposals to Determine Endangered Status for the Shortnose Sucker and Lost River Sucker,* 52 Fed.Reg. 32145–46 (Aug. 26, 1987). The result was a reduction in the range and numbers of both species by more than 95 percent. 52 Fed. Reg. 32145.

Consistent with the ESA's mandate, the FWS considered five factors in its decision to list the suckers in 1988:(1) the present or threatened destruction, modification, or curtailment of its habitat or range; (2) overutilization for commercial, recreational, scientific, or educational purposes; (3) disease or predation; (4) the inadequacy of existing regulatory mechanisms; and (5) other natural or manmade factors affecting its continued existence. 16 U.S.C. § 1533. First, regarding destruction of habitat, the FWS found: "Most of the spawning habitat for the shortnose sucker and Lost River sucker has been lost. The primary factor may have been the construction of the Sprague River Dam at Chiloquin, Oregon." 53 Fed.Reg. 27131 (July 18, 1988). The dam, located upstream of the junction of the Sprague and Williamson Rivers, probably eliminated 95 percent of the historical spawning habitat. *Id.* Additional problems with water quality were attributed to timber harvest, removal of riparian vegetation and livestock grazing. *Id.* at 27132. Second, as to over-harvesting, the FWS noted that the Oregon sport fishery for Lost River suckers had been discontinued in 1987. In 1985, Lost River suckers had comprised 92 percent of the catch, whereas shortnose suckers had accounted for 3 percent. 53 Fed.Reg. 27132. No commercial take, or significant collection for scientific or educational purposes was

documented. *Id.* Third, with respect to disease or predation, the FWS concluded that "[e]xotic fishes have been stocked into Klamath Basin and may have played some role in the decline of the shortnose sucker and Lost River sucker." *Id.* The FWS noted that exotic fishes can serve as sources of parasites or diseases. Fourth, in evaluating the inadequacy of existing regulatory measures, the FWS concluded that sufficient state laws do not exist to protect the habitat, although an Oregon law required a permit to take species for scientific or educational purposes and Oregon had discontinued the sport fishery for Lost River suckers. *Id.* Finally, regarding natural or manmade factors affecting the suckers' existence, the FWS identified the hybridization of sucker species and sucker die-offs, which were attributed to hot, dry conditions, and were compounded by pollution of the lake and decreased summer inflows, perhaps caused by diversion of water for agricultural purposes. *Id.*

The 2001 status report considered the population estimates of the Lost River and shortnose suckers, stating "[a]lthough the available population estimates provide perspective on population size, the high variability of the system, sampling constraints, and inherent, though unavoidable weaknesses of sampling methodology have made it extremely difficult to obtain accurate population estimates." 2001 status report at Section III, Part 2, page 40. The 2001 status report concludes that, while "trends are apparent," it is unclear what the annual population sizes are in Upper Klamath Lake and the "available information should be used with extreme caution when drawing conclusions about annual changes in populations size." *Id.* at 44–45.

The 2001 status report questioned the U.S. Geological Survey ("USGS") population estimates for adult suckers because the USGS utilized a method to estimate abundance that is "not statistically robust under violations of its assumptions * * *." 2001 status report at Section III, Part 2, p. 41. Specifically, the 2001 status report identified the assumptions relied on by the USGS as being that marked fish have mixed randomly in the population and that all fish had an equal chance of being marked. The 2001 status report also suggested that a violation of at least one of these assumptions likely occurred. First, the USGS estimate relied on data in which fifty percent of tagged fish recaptured after the 1997 fish kill were collected on one date, which indicated that fish were unlikely to have mixed randomly into the Summer Upper Klamath Lake population. Second, the assumption that all fish in the kill sample had an equal opportunity to be marked also appeared wrong because Upper Klamath Lake sucker populations use various spawning sites besides the Williamson/Sprague rivers where the tagging had been done. Thus, the 2001 status report concluded that the "broad confidence intervals and uncertainties associated with these data make absolute population estimates and inter-annual comparisons inappropriate." *Id.* at 41.

In discussing the population estimates at the time of listing, the 2001 status report states that the sucker populations were considered very low relative to former population sizes based on a number of factors, but that "no populations estimate was available." *Id.* at 45. Although by 1995 there was an increase in the number of spawning suckers in the Williamson and Sprague rivers due to a strong recruitment (reproduction) class in 1991, the fish kills of 1995–1997 resulted in an estimated eighty to ninety percent reduction in the adult populations of both species. *Id.* However, the 2000 spawning run found slightly higher abundance index values than the previous three years, which the 2001 status report found to be "indicative of possible improving population status."

*Id.* Still, the 2001 status report interpreted the loss of several spawning stocks in various creeks to be evidence of declining sucker populations.

Regarding larval and juvenile sucker abundance, the 2001 status report found that between 1995 and 1998 the larval and juvenile sucker abundance generally declined. While adult spawning runs indices of both species of suckers also declined, larval and juvenile numbers reversed their declining trend and were abundant in 1999, which suggested a poor stock recruitment relationship. The 2001 status report found that in 1999 the mean whole-lake abundance index for age 0 suckers (meaning those in their first year) of 300,000 was the highest since 1995, but that the abundance indices in September and October were less than in August in all years. The 2001 status report suggested that the causes could be a shift in habitat from shoreline to offshore areas, downstream movement of young suckers, or high mortality rates.

## B. Procedural background.

On October 19, 2001, James Buchal (counsel for plaintiffs Walt Moden, Merle Carpenter, Charles Whitlatch, John Blair, Tiffany Baldock, and Dave Victorine) filed a petition with the FWS to delist the suckers as endangered species under 16 U.S.C. § 1533 of the ESA. The petition alleged that "the information used by the USFWS to list the two sucker species as endangered under [sic] was at least erroneous, if not fraudulent." Fed. Def. Mem. in Supp. of Mot. for Sum. J., Ex. A, p. 4. As authority, the petition cited testimony of David Vogel, a fisheries scientist who spent fourteen years with the FWS, one year with the National Marine Fisheries Service, and more than ten years as a consultant, that "[t]he USFWS so selectively reported the available information that it can only be considered a distorted view of information available to the agency at that time." *Id.* A footnote in the petition listed an internet address where Vogel's testimony was available, stating that "Petitioners hereby incorporate [Vogel's] testimony, the scientific studies cited in it, and indeed the entire administrative record in connection with the post-listing administrative and legal proceedings concerning the suckers as additional supporting data for this petition." *Id.* at 4, n. 1. Citing Vogel's testimony, the petition contends that in contrast to the lack of recruitment described in 1988 when the species were listed, the Upper Klamath Lake sucker populations have experienced substantial recruitment in recent years, and that the geographic range in which the suckers can be found is now known to be much larger than believed at the time of listing. *Id.* at 4. Again citing Vogel's testimony, the petition asserts that "either 'the estimates of the sucker populations in the 1980s were in error and did not, in fact, demonstrate a precipitous decline' (i.e., the populations were much larger than assumed)' or 'the suckers have demonstrated an enormous boom in the period since the listing and no longer exhibit "endangered" status.' " *Id.* Thus, the petition argues that federal law requires that the suckers be delisted as endangered species.

On May 14, 2002, the FWS published in the Federal Register its finding regarding the plaintiff's delisting petition. Initial Finding at 34422. The Initial Finding stated that the petition's supporting documentation consisted of four pages and "Figures 2 & 3" from Vogel's testimony before the House Committee on Resources in 2001, five bibliographic references, and eight footnotes. *Id.* at 34422–23. Although stating that the footnotes support the information in Figure 2 of the petition, which provided estimates of the populations of the suckers,[1] the Initial Finding

---

1. Figure 2 is reproduced *infra.*

found that "[t]he information in the testimony was previously available to the Service and was considered in a 2001 status re[port] of the Lost River and shortnose suckers." *Id.* at 34423.

In analyzing the contentions in the petition, the FWS relied on the 2001 status report of the Lost River and shortnose suckers, which drew from all information provided in published and unpublished reports on the biology, distribution, and status of the listed sucker species. Regarding Vogel's contentions of improved populations of suckers, the FWS stated that "the early population estimates were based on the available, though limited, sampling data and from creel surveys for the sport and subsistence fishery for suckers, which declined precipitously in the 1980s and caused the Oregon Department of Fish and Wildlife to terminate the fishery in 1987, just prior to the federal listing." *Id.* The FWS then stated: "Comparisons between current estimates and those made during the fishery, prior to its termination in 1987, are not informative due to extreme differences in methodology. Population estimates made since listing, while numerically higher than earlier estimates, show no overall trend for increasing populations within the last decade." *Id.* The FWS explained that "the 2001 status re[port] identifies continuing threats to the two species which warrant maintaining their listing as endangered under the Endangered Species Act, including but not limited to habitat loss, degradation of water quality, periodic fish die-offs, and entrainment into water diversions." *Id.*

The Initial Finding stated that the FWS had "reviewed the petition and its supporting documentation, as well as other available information, published and unpublished studies and reports, and agency files * * * [and][o]n the basis of the best scientific and commercial information available,

we find that no substantial information has been presented or found that would indicate that delisting of the Lost River sucker or shortnose sucker may be warranted." *Id.*

**STANDARDS**

Although ordinarily the moving party is entitled to summary judgment where no genuine issue as to any material fact exists, in cases challenging agency decisions there are generally no underlying facts. *Occidental Eng'g Co. v. INS,* 753 F.2d 766, 769 (9th Cir.1985). The Ninth Circuit has stated that when a district court is reviewing a decision of an administrative agency, the administrative agency is finder of fact, and "summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *Id.* at 770. The District of Columbia Circuit has explained: "[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal. The 'entire case' on review is a question of law." *American Bioscience v. Thompson,* 269 F.3d 1077, 1083 (D.C.Cir.2001).

Agency action made reviewable by a statute that does not provide its own internal scope and standard of review, such as the ESA citizen suit provision, is governed by the APA. 5 U.S.C. § 704. The court's review of an agency's decision is limited to the administrative record already in existence. *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). Under the APA's deferential standard of judicial review, an agency's action may be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The court is not permitted to substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91

S.Ct. 814, 28 L.Ed.2d 136 (1971). *Southwest Center for Biological Diversity v. U.S. Forest Service*, 100 F.3d 1443, 1450 (9th Cir.1996). Rather, the court should defer to the agency's scientific and technical expertise so long as the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). Thus, the court must consider whether the agency acted within the scope of its authority, whether the agency adequately explained its decision, and whether the agency based its decision on the facts in the record, whether the agency considered the relevant factors. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Despite the deferential standard, a reviewing court must undertake a "thorough, probing, in-depth review" of the agency's decision and then decide whether it was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. at 415–16, 91 S.Ct. 814.

## DISCUSSION

Defendants move for summary judgment, arguing that the FWS's finding on the petition to delist was based on a rational, articulated consideration of all relevant factors and is entitled to deference. Defendants contend that the petition to delist the suckers lacked sufficient support and detail to constitute "substantial scientific or commercial information indicating that the petitioned action may be warranted." Moreover, defendants argue that the information contained and referenced in Vogel's testimony had been considered by the FWS during the 2001 status review of the suckers. Defendants refute the accuracy of the population estimates made by Vogel, citing documents in the administrative record that state the populations "are not more abundant and widespread than assumed at the time of listing."

Plaintiffs make of number of arguments as to why the FWS's refusal to reconsider the status of the suckers is arbitrary and capricious. Regarding the standard of review, plaintiffs contend that because the FWS considered more information than that contained in the petition to delist the suckers, this court should not review only the information presented by the petition itself, but all information before the agency in considering whether the substantial information is present. Additionally, plaintiffs argue that the FWS is not entitled to a high degree of deference because qualified experts were not involved, and because the statutory hurdle that a petition must present evidence sufficient to show a review "may be warranted" is not difficult to surmount. On the merits, plaintiffs assert that the FWS arbitrarily and capriciously disregarded the population resurgence of the suckers as demonstrated by Vogel, and that the remaining factors initially relied upon by the FWS in listing the suckers no longer support the listing.

Defendants also move for summary judgment on claim two of the complaint, which makes the same allegations but under the ESA citizen suit provision in 16 U.S.C. § 1540(g)(1)(C). Defendants argue that the scope and standard of review under the APA and the ESA citizen suit provision is the same because the ESA does not create an internal standard or scope of judicial review. Alternatively, defendants allege that summary judgment is appropriate because plaintiffs failed to comply with the ESA citizen suit's mandatory 60-day notice provision. Plaintiffs respond that the petition to delist stated "[t]his letter provides notice, pursuant to

16 U.S.C. § 1540(g), of the intent of the petitioners to pursue any and all legal remedies available under the Act * * *."

In addition to defendants' motion for summary judgment, plaintiffs have filed a motion to expand the administrative record to include a biological opinion issued by the FWS in March 1991 and four documents generated before the initial listing of the suckers in 1988. Plaintiffs argue that the biological opinion includes an observation by the FWS that "both sucker species are long lived, fecund, and well adapted to drought conditions," which they argue is relevant to a determination of whether the suckers are at risk from drought-related problems. Plaintiffs allege that the four documents that predate the listing in 1988 underscore the drastic decline in suckers in the 1980s. Defendants oppose expanding the record because no exception exists to expanding the record and none of the documents demonstrate that a relevant factor was not considered by the FWS.

### A. Defendants' motion for summary judgment regarding claim one.

The ESA instructs the Secretary of the Interior to consider five factors in determining whether a species is "threatened" or "endangered": (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence. 16 U.S.C. § 1533(a)(1)(A)-(E). A "species" includes a subspecies or any "distinct population segment * * * which interbreeds when mature." 16 U.S.C. § 1532(16). An "endangered" species is one that "is in danger of extinction." 16 U.S.C. § 1532(6). The Secretary makes the determination of whether a species is endangered "solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction, or on the high seas." 16 U.S.C. § 1533(b)(1)(A).

An interested person may petition the FWS to list, delist or reclassify the status of a species. 16 U.S.C. § 1533(b)(3)(A). In contrast to the "best scientific and commercial data" standard applied to actually listing a species, the FWS reviews listing and delisting petitions for "substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A). To the maximum extent practicable, the FWS must determine whether the petition presents such information within 90 days after receiving a petition. 16 U.S.C. § 1533(b)(3)(A). "Substantial information is that amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted." 50 C.F.R. § 424.14(b)(1). Further, in evaluating substantiality, the Secretary shall consider whether the petition:

(i) Clearly indicates the administrative measure recommended and gives the scientific and any common name of the species involved;

(ii) Contains detailed narrative justification for the recommended measure, describing, based on available information, past and present numbers and distribution of the species involved and any threats faced by the species;

(iii) Provides information regarding the status of the species over all or a significant portion of its range; and

(iv) Is accompanied by appropriate supporting documentation in the form of bibliographic references, reprints of pertinent publications, copies of reports or letters from authorities, and maps.

50 C.F.R. § 424.14(b)(2).

Here, plaintiffs argue that the petition to delist contained substantial scientific or commercial information about the population estimates of suckers that may warrant delisting. Figure 2 of the petition is titled "Shortnose and Lost River Sucker Populations 1950's 1997," and contains estimates of sucker populations, as follows:

| Species | 1950s - early 1960s | 1970 | 1976 | 1984 | 1985 | 1986 | 1987 | 1996 | 1997 |
|---|---|---|---|---|---|---|---|---|---|
| Lost River Suckers | Unknown | Unknown | Unknown | 23,123 | 11,861 | 6,000 | Unknown | 94,000 | 46,000 |
| Shortnose Suckers | Extremely Low (<200) | Very rare | 200-1,000 | 2,650 | 1,490 | 500 | only 20 seen | 252,000 | 146,000 |

Relying on the data presented in Figure 2, plaintiffs argue that the suckers have experienced a resurgence that calls into question the continued need to list them as endangered under the ESA. In evaluating plaintiffs' population estimates, the Initial Finding states that "[t]he footnotes support the information in Figure 2 of the petition." However, the FWS dismissed any increase in the populations, stating "[c]omparisons between current estimates and those made during the fishery, prior to its termination in 1987, are not informative due to extreme differences in methodology." Further, the FWS found that, while the population estimates are numerically higher, they "show no overall trend for increasing populations within the last decade."

■ After reviewing the petition to delist the suckers, the Initial Finding and the administrative record, I find that the FWS acted arbitrarily and capriciously in concluding that the petition did not present substantial scientific or commercial information indicating that a status review may be necessary. I reach this conclusion for the following reasons: (1) the standard in reviewing a petition to delist does not require conclusive evidence that delisting is warranted; (2) under the statute and the regulations the petition contains substan-

tial evidence that a reasonable person could conclude that delisting may be warranted; and (3) the FWS's conclusion that the population estimates are uninformative is unexplained and not supported by the administrative record.

First, the statute, regulations and the FWS's "Petition Management Guidance" manual all contemplate review of a petition to determine whether a reasonable person would view the information in the petition as indicating that the petitioned action may be warranted. The ESA directs the Secretary to evaluate a petition to determine whether it contains "substantial scientific or commercial information *indicating* that the action *may* be warranted." 16 U.S.C. § 1533(b)(3)(A)(emphasis added). Similarly, the regulations define "substantial" information in non-stringent terms, stating that it is "that amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted." 50 C.F.R. § 424.14(b)(1). Moreover, the regulations explicitly require a petition to contain narrative justification for the recommended measure "describing, based on available information, past and present numbers and distribution of the species involved and any threats faced by the species." 50 C.F.R. § 424.14(b)(2)(ii). Final-

ly, the "Petition Management Guidance" manual directs the FWS to make a "substantial" finding on the information submitted with the petition "if the information submitted with and referenced in the petition * * * indicates that the species may have achieved the recovery objectives for reclassification or delisting * * *." Petition Management Guidance, p. 15. While certainly the FWS need not conduct a status review for every petition it receives, the standard for evaluating whether substantial information has been presented by an "interested person" is not overly-burdensome, does not require conclusive information, and uses the "reasonable person" to determine whether the substantial information has been presented to indicate that the action may be warranted.

The information in the petition regarding population estimates could lead a reasonable person to believe that delisting may be warranted. The petition contains populations estimates that the Initial Finding stated were supported by the footnotes and that are numerically higher than earlier estimates at the time of listing. Those estimates state that in 1996, 252,000 shortnose suckers and 94,000 Lost River suckers were present in Upper Klamath Lake, with the numbers decreasing in 1997 to 146,000 shortnose suckers and 46,000 Lost River suckers. At the time of listing, however, the estimated populations of shortnose suckers in Upper Klamath Lake had dropped to 2,650 in 1984, with "too few shortnose suckers to accurately estimate the population in 1985 and 1986." 53 Fed. Reg. 27131. Similarly, the population of Lost River suckers had declined from 23,-123 in 1984, to 11,861 in 1985, with no estimate for 1986. *Id.* On the basis of the substantially higher population estimates set forth in the petition, a reasonable person could conclude that the sucker populations have increased and may warrant delisting.

 Even though a reasonable person considering the information presented in the petition could conclude that delisting may be warranted, the FWS's conclusion that the petition does not contain substantial scientific or commercial information is entitled to deference, and this court will not substitute its judgment for that of the FWS. I must, however, undertake a thorough, probing and in-depth review of the administrative record to consider whether the FWS adequately explained its decision, based its decision on the facts in the record, considered the relevant factors, and articulated a rational basis for its conclusion.

 The FWS rests its conclusion on two bases: (1) comparisons of population estimates are uninformative due to extreme differences in methodology and show no overall trend for increasing populations within the last decade; and (2) the 2001 status report identifies continuing threats which warrant maintaining the listing as endangered.

Regarding the population estimates, the 2001 status report questions the populations estimates made within the last decade, urging caution in making inter-annual comparisons because catches are biased by many factors, especially sampling biases, timing and sensitivity to weather and water conditions that may vary spatially and temporally. Further, the 2001 status report criticizes the method used by the USGS to estimate abundance because of assumptions that may have been violated that would undermine the estimates. However, the 2001 status report does not explore the differences in methodology between estimates in the 1990s and the 1980s, except to say that "no accurate population estimate was available."

In contrast, the Initial Finding appears to rely on the population estimates within the last decade in concluding that the esti-

mates "show no overall trend for increasing populations," but does explain why the earlier estimates, which used an extremely different methodology, are uninformative. Because the estimates made in the 1980s and those made in the 1990s both attempted to measure sucker populations, extreme differences in methodology without evidence of erroneous data does not render a comparison per se uninformative.

And while the administrative record shows that the FWS considered the 2001 status report warnings about inter-annual population estimates since listing—stating "sampling constraints, interannual environmental variability, high mortalities in fish die-offs, very broad confidence intervals, and difficulty in meeting statistical assumptions make comparisons between years and absolute population estimates inappropriate"—FWS apparently relied on the estimates in concluding that "population estimates made since listing, while numerically higher than earlier estimates, show no overall trend for increasing populations within the last decade." Again, the administrative record does not contain evidence to support this conclusion. Additionally, in contrast to the Initial Finding's conclusion that population estimates show "no overall trend," the 2001 status report stated that "trends are apparent, although the available information should be used with extreme caution when drawing conclusions about annual changes in population size."

Thus, I find that the FWS has not adequately explained its conclusions, and that the conclusions do not appear to be supported by the administrative record. I remand to the FWS to more fully explain the differences in methodology that render comparisons between current estimates and estimates prior to listing uninformative. Further, the FWS must extrapolate on the data supporting its conclusion that estimates "show no overall trend for in-creasing populations within the last decade," particularly in light of the 2001 status report's conclusion that "trends are apparent."

## B. Defendants' motion for summary judgment regarding claim two.

■ Defendants contend that summary judgment on claim two is appropriate because there is no practical difference between a claim brought under the APA or the citizen suit provision of the ESA, and because the plaintiffs failed to meet the 60–day notice requirement. Plaintiffs respond that notice was provided by the petition.

The citizen suit provision of the ESA allows a person to file suit "against the Secretary where there is an alleged failure of the Secretary to perform any act or duty which is not discretionary with the Secretary." 16 U.S.C. § 1540(g)(1)(C). The citizen suit provision requires a plaintiff to provide the Secretary with notice that suit will be brought under § 1540(g)(1)(C), stating no action may be commenced "prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation." 16 U.S.C. § 1540(g)(2)(A)(ii). The Ninth Circuit has stated that "[t]his sixty-day notice requirement is jurisdictional," and that "[a] failure to strictly comply with the notice requirement acts as an absolute bar to bringing suit under the ESA." *Southwest Center for Biological Diversity v. Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir.1998).

Here, plaintiffs stated in their delisting petition that "[t]his letter also constitutes notice pursuant to 16 U.S.C. § 1540(g), of the intent of the petitioners to pursue any and all legal remedies available to them under the Act or otherwise to compel your faithful discharge of your duty to remove

these 'species' from the list. Petitioners reserve the right to enter litigation to ensure appropriate and lawful actions on the part of NMFS and USFWS." As defendants point out, however, at the time plaintiffs provided defendants with notice, the agency had not considered the petition to delist. Therefore, because the agency had not acted on the petition at the time of notice, plaintiffs could not have given the Secretary notice of an unlawful action. Thus, I dismiss claim two of plaintiffs' complaint for failure to give notice as required under § 1540(g)(2)(C).

### C. Plaintiffs' motion to supplement the record.

▮ Plaintiffs have filed a motion to supplement the administrative record with five documents, including a 1992 Biological Opinion and four documents generated prior to the listing of the suckers. Under the APA, the court is to review the agency decision "based on the record the agency presents to the reviewing court." *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). The Ninth Circuit permits a court to consider documents outside the administrative record in four limited situations: (1) when necessary to determine whether the agency has considered all relevant factors and has explained its decision; (2) when it appears that the agency has relied on documents or materials not included in the administrative record; (3) when necessary to explain technical terms or complex subject matter involved in the agency action; or (4) when there is a strong showing of bad faith or improper behavior by the agency. *See Southwest Center for Biological Diversity,* 100 F.3d at 1450.

▮ Plaintiffs argue that the five documents should be added to the administrative record under the first exception—that the documents allow the court to review whether the agency failed to explain its

actions, which frustrates judicial review. After reviewing the documents, I grant plaintiffs' motion. The 1992 Biological Opinion states that suckers are "well adapted to drought conditions," which plaintiffs argue is relevant to the continuing threat to suckers of intermittent fish kills. The administrative record contains a 2001 Biological Opinion on Klamath Project operations that superseded the 1992 Biological Opinion, but gives no indication that the 1992 opinion is inaccurate. Although fish kills are not entirely a drought-related problem, the evidence is relevant to a factor that the FWS should have considered. Further, the four documents that predate the listing of the suckers are relevant to the factor of whether the suckers populations have recovered. Because the Initial Finding distinguishes population estimates, citing extreme differences in methodology, the administrative record should be expanded to include the four documents pertaining to the state of the population prior to listing.

### CONCLUSION

Defendants' motion for summary judgment (# 33) is granted in part and denied in part. Claim One in the amended complaint is remanded to defendants for further proceedings in accordance with this opinion; Claim Two in the amended complaint is dismissed. Plaintiffs' motion to supplement the record (# 37) is granted.

It is so ordered.